IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 19, 2003

## JACOB LEE DAVIS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Lincoln County**
**No. S0300138    Charles Lee, Judge**

---

**No. M2003-00744-CCA-R3-PC - Filed February 11, 2004**

---

Petitioner, Jacob Lee Davis, filed a pro se petition for post-conviction relief and was appointed counsel to assist him during the post-conviction hearing. Following the evidentiary hearing, the trial court dismissed Petitioner's petition for post-conviction relief. On appeal, Petitioner argues that his trial counsel rendered ineffective assistance of counsel because they (1) failed to properly conduct voir dire or preserve for appeal the issues concerning the selection of jurors; (2) failed to pursue meaningful plea negotiations; and (3) failed to adequately apprize Petitioner of his right to testify. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the appellant, Jacob Lee Davis.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; W. Michael McCown, District Attorney General; and Ann L. Filer, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Following a jury trial, Petitioner was convicted of first degree murder, reckless endangerment, and carrying a weapon on school property. Petitioner received a sentence of life imprisonment for the murder conviction with concurrent sentences of one year for each of the other convictions. The facts surrounding Petitioner's convictions were summarized by this Court in the direct appeal in *State v. Jacob Lee Davis*, No. M1999-02496-CCA-R3-CD, 2001 WL 487688 (Tenn. Crim. App., Nashville, May 8, 2001) as follows:

In 1997, at the start of their senior year at Lincoln County High School, in Fayetteville, Tennessee, Nick Creson (the victim) and Tonya Bishop had been involved in a two-year relationship. Creson and Bishop lived in the same neighborhood, attended the same church, and had attended school together since sixth grade. In the fall of 1997, Creson and Bishop broke up and Bishop began to date the Defendant. Bishop testified that although she and Creson were no longer dating, they continued to share a locker, had classes together and often engaged in sexual relations, until some time following the Christmas of 1997. Bishop further testified that the Defendant was jealous of Bishop's continued association with Creson.

In March of 1998, Defendant discovered that Bishop and Creson were having sexual relations and he confronted Bishop about it. Bishop testified that she and the Defendant had a three to four hour discussion in her car in the school parking lot, during which the Defendant was crying and shaking uncontrollably. The next day, Defendant delivered the following letter to Bishop:

> Tonya: In case you missed it at break, I want to scream. When someone has a problem they usually go to friends and lay their head on a shoulder. I don't have a shoulder. You told me last night to shut my mouth. Well here it is.
>
> You know I will not leave you and you take advantage of me. I scream in protest, and you talk about work. I scream because I have the fate to fall for one who could not be mine, and you talk about the weather. I don't deserve this, Tonya. From the beginning I have given you nothing but my all. For what? To be with you. That is all I have asked. I am faithful, I am true, I am honest. My heart screams, "how could you?" You talk about you are not at work.
>
> I bleed, and for that he should bleed as well. Justice says he deserves it. I want to hear his skin sear and pop under fire while I stand in front of him and recite the lyrics to Soma by the Smashing Pumpkins. I want to put a three inch diameter hole in his chest from a 12 gauge. I want to dip my finger in his blood and write the words to the song Mayonnaise on his truck. My friends say I should take his anger out on you. You know as well as I do I can't do that. It must go somewhere. Thus this letter.
>
> Don't forget. Don't look innocent and say that I am scaring you. If this doesn't show my pain, I will give up. Then I will know you won't sympathize with me. Under the circumstances this is a mild reaction. You told me not to keep it inside. This is what is inside. It's not all

that is inside. Also inside of me is your heart, the sunshine you are in my life. But it has to rain sometimes. Remember I love you.
Jacob Davis

Defendant and Bishop continued to date and in April of 1998, the two began to have sexual relations. Bishop testified that the Defendant seemed happier, although he continued to call her late at night or early in the morning, thinking that Creson would be at Bishop's house. Bishop and Defendant attended the senior prom together in early May, and again she stated that Defendant appeared to be happy.

On the evening of May 18, 1999, Bishop and Defendant left work at Shoney's and went to Wal-Mart to purchase a pregnancy test for her. While there, Bishop told the Defendant that she had purchased a pregnancy test with Creson on a prior occasion. Upon hearing this information, Defendant fell to the floor and began crying and shaking uncontrollably. Bishop was able to console Defendant and the two left Wal-Mart between 10:30 and 11:00 p.m. Defendant and Bishop went to Bishop's house, where they had sexual relations, and Defendant left around 1:00 a.m.

The next morning, Defendant and Bishop met at Shoney's at 7:00 a.m. and then proceeded to take their physics final exam at 8:00 a.m. Bishop testified that the Defendant seemed to be in a good mood. Tiffany Roberts, Defendant's physics teacher, testified that the Defendant was joking around with other students. Roberts further testified that the Defendant was the first to finish his exam and that upon finishing, he asked her for some paper. The Defendant used this paper to write Roberts a three page letter, in which he berated her style of teaching and the school system. The Defendant further wrote about the pain he believed Roberts caused him, by discussing matters involving his relationships with Bishop, with the victim and with other students in Roberts' physics class. Defendant also wrote the following in the letter that he delivered to Roberts as he left her class at 9:45 a.m.:

\* \* \*

If the opinions you have formed of me have been strictly based on my academic performance I highly regret and resent that you decided to make it a personal matter. Perhaps you knew what you were doing at the time and perhaps you did not. But you dealt me a very devastating personal insult earlier this year by discussing my personal life with that bastard Nicholas Creson (may his soul burn in eternal torment and the fires of hell itself) and the entire fourth period Physics class. You were a large part of the greatest pain I have ever known; a pain which nearly caused me to take my own life. With the help of my family I made it through this.

-3-

Before you decide to rip at a student's life, next time please reconsider. It might save someone the pain that I have experienced at your hands.

During the next period, approximately 10:00 a.m., Bishop and the Defendant met to clean out the locker that they shared. Bishop testified that, after they had finished cleaning out their locker, the Defendant walked her to her next class. As Bishop and the Defendant were walking, Nick Creson and Cassandra Sharp were walking behind them, when Sharp threw a penny and hit Bishop. The Defendant heard the penny hit the floor, so he turned around to find Creson standing behind them. Bishop testified that Creson said a few words to the Defendant, but the Defendant did not say anything back. Following this incident, Bishop went to her class, while the Defendant went to his drama class. In her testimony, Sharp stated that she apologized for hitting Bishop, and then she and Creson walked to class.

At approximately 11:30 a.m., Bishop was sitting in her pre-calculus class (which she took with Creson), when the Defendant came to the class looking for Creson. Bishop testified that when Creson arrived in class, the Defendant stood staring at him. Bishop stated that Defendant "had his fists clenched beside him, straight down. Just stiff. He had his eyes like in a gaze. Just staring. He didn't say anything. He wouldn't talk. He just watched [Creson] walk into class." Again, Bishop attempted to console Defendant. Bishop stated that she did not see Defendant anymore that day, but later learned that he had left school.

That afternoon, Allan Higgs was sitting in shop class (at approximately 1:45 p.m.) when he saw the Defendant back his car into a space in the parking lot by the athletic field house. The testimony at trial showed that Creson was a football player, and every day for the past three years, he had gone to the field house at 2:00 p.m. for seventh period practice. As the bell rang at 2:00 p.m. for seventh period, Nick Creson walked toward the field house. Because classes were changing, there were approximately 100-150 other students in the area surrounding Creson, including Brad Schrimsher, who was standing directly behind Creson. Cassandra Sharp testified that as she was walking to meet Creson (it was their custom to walk to seventh period together), she saw the Defendant step out of his car, raise a rifle to his chest, point it at Creson and fire a shot from a distance of approximately 30 to 40 feet. Creson fell to his knees, holding his books up as a shield and pleading with the Defendant to stop shooting. The Defendant moved closer and fired a second shot, which caused Creson to fall on his back. Defendant continued to approach and fired the third and final shot down into Creson's chest. After this final shot, the Defendant placed the gun down and sat down on the ground near Creson's body.

Thereafter, the police arrived and arrested Defendant. Detective Bill Wood of the Fayetteville Police Department testified that he retrieved a box of live ammunition

from the front seat of the Defendant's car, along with a letter written by the Defendant and addressed to "Friends, Family, Tonya and all." The letter stated:

> I suppose when anyone reads this, I will be considered mentally insane. Those who really know me will confirm this is not the truth. Not by my standards. I have always believed since I was small that I do see the world through a totally unique set of eyes. However this is not the point here. I don't know what will happen to me this evening. I guess this will be goodbye should something happen to myself and I am not able to speak to those nearest to me.

Detective Wood was also given the murder weapon, a Marlin .22 caliber magnum rifle, which had been recovered by Ricky Byrant, a teacher at Lincoln County High School. Wood further testified that the Defendant fully complied with all of his instructions and that Defendant seemed to understand everything that was asked of him.

The Defendant presented proof from several witnesses, who testified regarding his behavior prior to the start of his senior year and after he began dating Tonya Bishop. Phyllis Davis, Defendant's mother, testified that on one occasion, the Defendant came home nervous and crying because he had discovered that Tonya was still having a relationship with the victim. Mrs. Davis stated that she noticed cuts on the Defendant's wrists, and the Defendant stated that he was at the point of suicide. Mrs. Davis explained that she and her husband were able to calm the Defendant. She further testified that prior to his senior year, the Defendant was a gifted straight "A" student, active in his school, about to become an Eagle Scout and excited about going to college at Mississippi State. Mrs. Davis told the jury that, after the Defendant began dating Tonya, he stayed out late into the night, his grades dropped dramatically, he barely slept and was lethargic all of the time. Mrs. Davis stated that, in the two days leading up to this tragedy, the Defendant appeared happy and normal. She further told the jury that her husband kept about four guns in the house, including the .22 rifle used in this case. She testified that her husband kept the .22 loaded. She also stated that the Defendant had shot these guns prior to this shooting incident.

The Defendant presented additional testimony from Aletha Lewter, Susan Holder, Amy Moyers and Teresa Evans, who each testified as to the changes in Defendant's behavior and attitude after the start of his senior year and the dating of Tonya Bishop. Further, at trial, there was no issue as to whether the Defendant shot Nick Creson. In fact, the only contested issue at trial was Defendant's mental state at the time of the offenses. On this point, the jury also heard testimony from one psychologist and two psychiatrists.

Dr. William D. Kenner, a specialist in child and adolescent psychiatry, testified on behalf of the Defendant. Dr. Kenner testified that he interviewed the appellant and reviewed numerous records concerning the Defendant, including a report from a neuropsychologist, Dr. Pam Auble. He concurred in Dr. Auble's conclusion that Defendant was suffering from a severe depressive disorder. Specifically, he opined that the Defendant was suffering from "major depression, severe, with mood congruent psychotic features." The doctor further explained that the Defendant had a "genetic predisposition" for depression and mental illness, given that his father, paternal grandmother, his maternal grandmother and his aunt, suffered from severe depression and were hospitalized at some point for their mental illnesses. Dr Kenner explained:

> [I]t is important to recognize that while--for a week before the shooting, Jacob had begun to hear voices, and these were voices that were talking to him in whispers. He thought it was somebody outside of him. And the voices were saying derogatory things to him.

> * * *

> [In] Jacob's case, he couldn't hear exactly what they were saying, but they were saying bad things about him. Occasionally they would say his name. And when he was alone and there was no possibility of anybody, you know, actually whispering, then he--it really scared him.

>  And as these events began to unfold, the voices would be loud at sometimes and more urgent and angry and so forth, and less so in others. And they were particularly intense when he was at Wal-Mart and that was happening. And then they quieted down some. They started coming back very loudly after the penny incident and so forth.

Dr. Kenner further noted that the Defendant was experiencing, "what's invariably called emotional high-jacking, in which an individual is taken over by his emotions" and also auditory hallucinations. Dr. Kenner opined that Defendant "was already out of touch with reality before th[e] incident at Wal- Mart came up."

Finally, Dr. Kenner opined that Defendant's capacity to premeditatedly and intentionally shoot Creson "was severely, very severely impaired." Moreover, Kenner opined that mental capacity:

> is never--I think it is never totally extinguished in anyone, but I think [Jacob] was operating on automatic. He was severely impaired at that time.

And further difficulty in--with reflecting and deliberating comes from the fact that he was psychotic. He had difficulty distinguishing between what were his thoughts and what were external sensory input, so that he heard these voices like as if someone were whispering to him or about him. But these were really his thoughts. So that grasp on reality had really slipped from him. And so that, again, has very severe consequences when it comes to trying to think logically, because it, again, is like thinking in a dream. You know, you just can't put things together like they ought to be. And that is how someone like Jacob Davis would be functioning at that time.

In rebuttal, the State presented the testimony of Dr. Sam Craddock, a psychologist employed by the Forensic Services Division of the Middle Tennessee Mental Health Institute. According to Dr. Craddock, the Defendant was admitted under the institute's 30-day in-patient evaluation procedure and was evaluated by the institute for approximately twenty-seven (27) days (April 20 to May 17, 1999). On the basis of this evaluation and the social history compiled by Rebecca Smith, a psychiatric social worker employed by the Forensic Services Division, Dr. Craddock opined the that the Defendant:

was experiencing a depressive disorder at the time. Was not severe to where I considered him to be psychotic or out of touch with reality or unable to accurately perceive reality. Nor to an extent that he was unable to form an intent.

He conceded that he had difficulty in rendering an opinion, since the team at the institute did not see the Defendant until eleven (11) months after the shooting incident. Dr. Craddock also opined that any auditory hallucinations experienced by the Defendant were due to "self-imposed" or "voluntary" sleep-deprivation. He concluded that, at the time of the murder, Defendant was capable of forming the requisite intent for premeditated first degree murder.

Dr. Rokeya Farooque, a psychiatrist employed by the Forensic Services Division, concurred in Dr. Craddock's opinion that Defendant was suffering from some "depressive disorder not otherwise specified." Dr. Farroque opined that 'at the time of the incident [Defendant] was not suffering from any kind of mental disease or defect that is going to make him incapable of forming intent." Moreover, she rejected Dr. Auble's and Dr. Kenner's diagnoses that Defendant was suffering from "major depression congruent with psychotic features" and that Defendant was suffering from auditory hallucinations. Dr. Farroque explained that interviews with Defendant and his friends and family reflected that at times the Defendant was sad and often felt

bad, particularly since he was in jail facing such serious charges. Due to Defendant's depressive feelings, she diagnosed him as having some "depressive disorder not otherwise specified." She further explained that her interviews and testing of the Defendant revealed that the Defendant only complained once about hearing someone calling his name or whispering to him, which she did not believe was consistent with hallucinations (i.e., "... when [people] hear voices and the voices talk with them continuously or torment them, talk among themselves; argue among themselves.").

*Davis*, 2001 WL 487688, *1-6.

On appeal, Petitioner challenged the sufficiency of the convicting evidence for each of his convictions and argued that the trial court erred in failing to strike six potential jurors for cause. This Court found the evidence sufficient to support each of Petitioner's convictions. Although Petitioner waived the issue concerning jury selection at the hearing on his motion for a new trial, this Court nonetheless concluded that the trial court properly qualified the six potential jurors. Also, five of the six were removed by use of peremptory challenges. *Id.,* at *9. The Supreme Court denied Petitioner's Tennessee Rule of Appellate Procedure 11 application for permission to appeal on October 8, 2001.

## II. Post-Conviction Hearing

Petitioner testified that he was twenty years old at the time of his trial and deferred to his trial counsel, Raymond W. Fraley, Jr. and Richard McGee, on all matters concerning legal strategy. He did not disagree that Mr. Fraley and Mr. McGee spent countless hours preparing for the trial and that they investigated and prepared the witnesses "exceptionally well." Although he understood the difference between the potential sentences for second degree and first degree murder, Petitioner said that he was not advised that there was a substantial risk that he would be convicted of first degree murder. Petitioner said that he was not involved in the plea negotiations although he understood that the State had offered to reduce the charges to second degree murder with a recommended sentence of thirty to thirty-five years. If he had been adequately apprized of the seriousness of his case, Petitioner said that he would have accepted the State's plea offer.

Petitioner said that he understood the importance of the selection of a jury and was aware that the Court of Criminal Appeals had addressed the issues surrounding the impanelment of certain jurors on appeal.

Petitioner said that he and his trial counsel discussed his right to testify for "a minute or less." Essentially, Mr. Fraley and Mr. McGee advised him not to testify, and he agreed with their advice. Petitioner indicated, however, that he felt he should have testified at trial in order to personalize the mental problems he was suffering at the time rather than relying only on the testimony of psychiatrists. On cross-examination, Petitioner conceded that several lay witnesses, including his mother and his girlfriend, testified as to his state of mind at the time of the incident.

Mr. Fraley has been a practicing attorney for thirty years. He described the environment surrounding Petitioner's trial as "difficult" due to the general emotional outcry following the school shooting at Columbine High School in Colorado. Mr. Fraley said that even though Petitioner's defense that he was incapable of forming premeditation did not work, he would not have presented any other defense. Mr. Fraley felt that Petitioner's mental state was the only explanation for his actions.

Mr. Fraley agreed that the selection of the jury was a critical component of the trial. Although he thought some of the jurors should have been removed for cause, Mr. Fraley believed that the jurors eventually selected were "as good as we were going to get."

Mr. Fraley said that he discussed the potential sentences for first degree murder and the lesser-included offenses of second degree murder and manslaughter with Petitioner. Mr. Fraley, not the State, was the one who first brought up the possibility of settling Petitioner's case. Mr. Fraley said that he asked the State to consider reducing the charge against Petitioner to manslaughter with a sentence beyond the statutory range at thirty to thirty-five years. The State told Mr. Fraley not to be "ridiculous." The State informed Mr. Fraley that the victim's mother did not want any sentence less than life imprisonment if Petitioner were convicted. Mr. Fraley said that more strenuous plea negotiations were not attempted because the State was not willing to negotiate.

Mr. McGee has practiced in the area of criminal law for twenty-five years and participated in over one hundred jury trials. He joined the defense team around the date of Petitioner's preliminary hearing. Mr. McGee recalled that certain jurors said during voir dire that they would not be able to consider evidence of Petitioner's mental state at the time of the offense to negate a finding of premeditation. Mr. McGee believed that the defense did not challenge the selection of one of the jurors from this group because he and Mr. Fraley feared that someone even less favorably inclined to their theory of defense might have been selected. Mr. McGee said that the trial court allowed Mr. McGee and Mr. Fraley to ask the potential jurors all the questions they felt were appropriate.

Mr. McGee said that he asked Mr. Fraley if there was any opportunity to settle Petitioner's case, and Mr. Fraley told him that the State had rejected his suggested sentence of thirty to thirty-five years. Mr. McGee discussed settlement again with the State during jury selection, but his overtures were rebuffed.

Mr. McGee advised Petitioner not to testify because he felt they had sufficiently portrayed Petitioner's side of the events surrounding the shooting through the defense's witnesses. Discussions concerning Petitioner's right to testify were conducted during the presentation of the defense's proof. Mr. McGee never altered his advice, and Petitioner never told him that he wanted to testify. Instead, Petitioner accepted Mr. McGee's recommendation that he not testify.

At the conclusion of the evidentiary hearing, the trial court concluded that Petitioner failed to show that trial counsel provided ineffective assistance during the jury selection process. As noted

on direct appeal, Petitioner's trial counsel removed five of the six potential jurors by use of peremptory challenges. Because this Court had already concluded that the trial court properly qualified the six jurors at issue, the post-conviction court found that Petitioner failed to demonstrate that he was prejudiced by any alleged deficiency in counsel's performance during voir dire. The trial court also found that there was no plea agreement in existence that could be communicated to Petitioner. Finally, the trial court concluded that Petitioner voluntarily and knowingly agreed not to testify at trial. The trial court specifically accredited the testimony of Mr. Fraley and Mr. McGee concerning the plea negotiations and the discussions concerning Petitioner's right to testify.

## II. Standard of Review

In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish by clear and convincing evidence that the conduct of petitioner's counsel fell below "the range of competence demanded of attorneys in criminal cases", and that petitioner was adversely affected by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L. Ed. 2d 674 (1974); *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975). In order to establish prejudice, the petitioner must show that there is a reasonable possibility that the outcome of the proceedings would have been different but for the ineffective assistance of counsel. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Because the petitioner must establish both deficient conduct and prejudice, relief will be denied if petitioner fails to prove either component. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

The post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed de novo with a presumption that the findings are correct unless the preponderance of the evidence establishes otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). In addition, questions concerning the credibility of witnesses and the weight and value given their testimony are resolved by the trial court, and not this Court. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). However, the application of the law to the court's factual findings, such as whether counsel's conduct was deficient or whether the petitioner was prejudiced, is reviewed de novo with no presumption of correctness. *Id.*

## III. Selection of Jurors

Mr. Fraley and Mr. McGee presented a hypothetical situation to the potential jurors during voir dire. The panel was told that Petitioner left the school's premises, went home and retrieved a

-10-

gun, then returned to school where he shot and killed the victim, Nicholas Creson. The jurors were then asked whether they could consider evidence as to Petitioner's diminished capacity to negate a finding of premeditation. Based on this limited factual situation, certain jurors said they could not consider Petitioner's mental state at the time of the shooting in mitigation of his actions.

Petitioner's trial counsel moved to strike this group of jurors for cause arguing that they had formed an opinion about the case which was not subject to change. The State objected because defense counsel failed to ask the jurors if they could follow the law as instructed by the trial court. The trial court then reopened voir dire and questioned each of the potential jurors who had expressed reservations of considering proof of Petitioner's mental state, specifically instructing each juror to disregard the hypothetical situation described by defense counsel. The trial court overruled Petitioner's challenge for cause as to those jurors who unequivocally stated that they could consider evidence concerning Petitioner's mental state and require the State to prove beyond a reasonable doubt that Petitioner was guilty. The trial court excused those jurors for cause who continued to maintain a preconceived opinion as to Petitioner's guilt. Out of the first group, defense counsel used peremptory challenges to remove five of the six jurors.

Petitioner argues that his trial counsel's conduct during voir dire was deficient because counsel, not the trial court, should have questioned each potential juror as to his or her ability to consider the evidence presented in court. The post-conviction court found that the approach taken by Mr. McGee and Mr. Fraley during voir dire was a "legitimate trial strategy." Our review of the record supports the post-conviction court's finding that counsel's performance in this regard was well within the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Furthermore, Petitioner has not shown that there is a reasonable probability that the result of his trial would have been different if his counsel had conducted voir dire differently. *See Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068. Defendant is not entitled to relief on this issue.

## IV. Right to Testify

Petitioner argues that his counsel's performance was deficient because Mr. McGee and Mr. Fraley only discussed Petitioner's right to testify with him for less than a minute. Petitioner acknowledges that counsel advised him that he had the right to testify. Petitioner contends, however, that he deferred to his counsel's recommendation that he not take the stand even though he actually wanted to testify. Mr. McGee testified that he explained to Petitioner that he had a right to testify, and they discussed whether or not Petitioner would take the stand throughout the trial. Defense counsel felt that Petitioner's side of the incident had been sufficiently portrayed through the defense's witnesses, and counsel advised Petitioner not to take the stand in order to avoid cross-examination. Mr. McGee said that Petitioner accepted his recommendation and never indicated that he wanted to testify.

The post-conviction court accredited the testimony of Mr. McGee and Mr. Fraley and concluded that Petitioner knowingly and voluntarily waived his right to testify. The trial court had the opportunity to view the demeanor of the witnesses at the post-conviction hearing. Questions

concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the post-conviction court, not this Court. *Burns*, 6 S.W.3d at 461. The evidence does not preponderate against the post-conviction court's finding that Petitioner made an informed decision concerning his right to testify. Petitioner is not entitled to relief on this issue.

## V. Failure to Preserve Jury Issues for Appeal

Although he offers no argument, Petitioner alleges that his trial counsel were ineffective for failing to preserve the issues concerning the selection of the jury for appeal. Whether or not counsel's decision to withdraw these issues at Petitioner's motion for a new trial was deficient representation, this Court nonetheless addressed the jury selection process in Petitioner's direct appeal and found no error on the part of the trial court in its qualification of the questioned jurors. Petitioner has failed to show that he was prejudiced by the conduct of his counsel in this regard or that the results of his appeal would have been any different if the issue had been presented for review during the motion for a new trial. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

## VI. Plea Negotiations

At the post-conviction hearing, Petitioner argued that his trial counsel was deficient for failing to relay information to him concerning the State's offer to settle his case. The post-conviction court found that there was no plea agreement to communicate to Petitioner. On appeal, Petitioner now argues that his trial counsel rendered ineffective assistance of counsel because they failed to pursue meaningful plea negotiations. Petitioner did not present this ground for relief to the post-conviction court, and this issue is accordingly waived. Tenn. R. App. P. 36(a).

Notwithstanding waiver, Petitioner has not shown that he was prejudiced by the failure of his counsel to continue to pursue an offer of settlement when the record clearly shows that the State was not willing to enter into plea negotiations. Whether or not to enter into plea negotiations is a matter left entirely to the district attorney general's discretion. *State v. Head*, 971 S.W.2d 49, 51 (Tenn. Crim. App. 1997). Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE